**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                              |     |                          |
| ---------------------------- | --- | ------------------------ |
|                              | *   |                          |
| **UNITED BANK,**             | *   |                          |
|                              | *   |                          |
| *Plaintiff*,                 | *   |                          |
|                              | *   |                          |
| **v.**                       | *   | **Case No. RWT 13-cv-3227** |
|                              | *   |                          |
| **DAVID BUCKINGHAM,** *et al.*, | *   |                          |
|                              | *   |                          |
| *Defendants.*                | *   |                          |
|                              | *   |                          |

## MEMORANDUM OPINION

This is a case about a bank behaving badly. Virginia Commerce Bank ("VCB"), later merged into Plaintiff United Bank ("United Bank"), made substantial loans to Defendants' father, John D. Buckingham, Sr. ("John") and John's company, Sun Control Systems, Inc. ("SCS"). In May of 2009, after the borrowers defaulted, VCB entered into a Forbearance Agreement with John and others that ultimately did not help. During that time, John was diagnosed with dementia and became incompetent. VCB knew of John's incapacity, and its lawyer even advised it to avoid dealings with John because of his incapacity.

Nevertheless, in a desperate effort to recover the millions of dollars that otherwise might be lost, VCB "negotiated"[1] a Second Amended Forbearance Agreement ("Second Amendment"), which assigned to VCB as additional collateral a security interest in certain life insurance policies. VCB had Thomas Buckingham ("Thomas"), one of John's sons and the then-acting president of SCS, obtain John's signature to the Second Amendment and to the assignment of the life insurance policies to VCB. Thomas did so, but forged some of John's signatures to complete the transaction.

---

[1] John was ostensibly a party to the Second Amended Forbearance Agreement, but, due to his incompetence, he was incapable of "negotiating" anything.

In state court litigation related to this case, Judge Joseph A. Dugan, of the Circuit Court for Montgomery County, Maryland, found the Second Amendment void because of VCB's misconduct in negotiating with a man it knew to lack capacity and in acquiring forged signatures. Judge Dugan's findings prevented VCB from directly obtaining the money it had attempted to recover through the purported assignments in the Second Amendment. Now, United Bank, VCB's successor by merger, attempts to recover that same money through the legal gymnastics of this lawsuit. The laws of equity, however, prevent United Bank from collecting money with hands made unclean by the grossly inequitable conduct of its predecessor. For that reason, as well as for reasons under applicable law, the Court will grant Defendants' Motions for Summary Judgment and deny United Bank's Motion for Summary Judgment.

## 1.    Factual Background

This opinion brings to an end an almost six-year dispute over the rights to the proceeds of eight life insurance policies covering John's life. Having been rebuffed by the Circuit Court for Montgomery County in its wrongful efforts to reach the policies through a transaction with a borrower known to be incompetent, United Bank now seeks to obtain the same result by challenging certain transactions executed by Defendant David T. Buckingham ("David"), one of John's sons, in his capacity as John's guardian.

*The Insurance Policies*

The insurance policies can be categorized into three groups. The first group contains two policies that John purchased from Northwestern Mutual and for which he paid the premiums directly (collectively, the "JDB policies"). ECF No. 120-1 at 5. The second group contains four policies that SCS purchased from Northwestern Mutual as an employment benefit for John. *Id.* at 4–5. As the owner of these policies, and pursuant to an Ownership Agreement between John,

SCS, and Northwestern Mutual, SCS paid the policy premiums, but John designated the beneficiaries. *Id.* at 5; ECF No. 120-5. When John died, SCS would recover up to the amount of premiums paid, and John's designated beneficiary would receive the rest (collectively, the "split dollar policies"). ECF No. 120-5. The third group contains two policies that SCS purchased from John Hancock Life Insurance Company, also as an employee benefit for John and for which it paid the policy premiums on John's behalf. ECF No. 120-1 at 5. Pursuant to an agreement between SCS and John, SCS would recover the premiums that it paid from the policies' death benefits, and the beneficiary designated by John would recover the remaining balance (collectively, the "John Hancock policies"). *Id.*; ECF No. 120-15 at 2–3.

*John's Dementia and SCS's Decline*

John's initial diagnosis of dementia came in 2008, which was confirmed as frontotemporal dementia in 2009. ECF No. 120-1 at 5; ECF No. 120-11 at 18. Despite his diagnosis, John was never removed or replaced on the board of SCS. ECF No. 120-1 at 5. While John battled dementia, SCS's business struggled. *Id.* at 6. By 2009, SCS was in default on debts it owed to VCB. *Id.* VCB had loaned SCS money, sometimes requiring John and Elizabeth Buckingham ("Betty"), John's wife, to guarantee the loans. *Id.* VCB had also loaned John and Betty money in their personal capacities through a home equity line of credit. *Id.* In May 2009, SCS and VCB entered into a Forbearance Agreement pursuant to which VCB agreed not to enforce certain security interests and to loan SCS additional money if SCS met a specified schedule of payments. *Id.* at 6–7; ECF No. 120-18 at 3. John, Betty, and Thomas, who was SCS's acting president, were also parties to the Forbearance Agreement. ECF No. 120-1 at 7. SCS's economic condition did not improve, and by early 2010, it had defaulted on the Forbearance Agreement. *Id.*; ECF No. 120-18 at 4; ECF No. 141-22.

*The Second Amended Forbearance Agreement*

In June 2010, while John was battling dementia, VCB prepared a Second Amended Forbearance Agreement with SCS. ECF No. 120-1 at 7; ECF No. 120-17 (Second Amendment to Forbearance Agreement). By that time, VCB had lost more than $5 million in just principal on the loans provided to SCS and John, making its current loss over $8 million including accrued interest, cost, and fees. Hr'g Tr. 3:13:00–13:35 (Nov. 27, 2017). When the company finally effectively went out of business, the only potential assets that were of any value were the disputed life insurance policies. *Id.* 3:13:50–14:13. As stated by United Bank at the summary judgment hearing, the policies collectively had a "value of several million dollars" upon John's death. *Id.* 3:14:15–14:25.

The Second Amendment assigned a security interest in the JDB and split dollar policies, including the death benefits under those policies, to VCB. ECF No. 120-1 at 8; ECF No. 120-17 at 9. When it was executed, however, VCB knew of John's dementia. ECF No. 120-11 at 28–41. VCB had been told by David and Thomas, as well as through medical reports shared with VCB, that John was suffering from very serious dementia and had only months to live. *Id.* Additionally, VCB's own experience with John's diminished capacity had led it to refuse to communicate with John. *Id.* VCB's outside counsel even recommended that it ask for John to undergo a medical evaluation to determine his competency. *Id.* However, VCB elected not to follow this advice. *Id.* When the Second Amendment was executed, VCB's counsel did not communicate with John and Betty regarding the transaction. *Id.* at 8. Instead, VCB asked Thomas to collect the necessary signatures, which he did. *Id.* Some of those signatures for John, however, were found by Judge Dugan to have been forged. *Id.* at 41.

*Petition for Guardianship of John*

In August 2010, two months after the Second Amendment was executed, Betty filed a petition for guardianship of her husband. ECF No. 120-1 at 6. In October 2010, the Circuit Court for Montgomery County appointed David guardian of his father's property and co-guardian, with Betty, of his father's person. ECF No. 120-2. In December 2010, the order was amended to make Betty the temporary guardian of John's person and David the temporary guardian of his father's property. ECF No. 120-3. In January 2011, the court issued a final order appointing David guardian of his father's property and co-guardian, with Betty, of his father's person. ECF No. 120-4.[2]

David did not learn of the Second Amendment until February 2011. ECF No. 120-1 at 6. In March 2011, David changed the beneficiary designations of the eight life insurance policies from Betty, or his father's estate in one instance and a prospective testamentary trust in another, to a newly created John D. Buckingham Life Insurance Trust ("JDB Life Insurance Trust") for the purpose of funding the support and care of John and Betty. *Id.* at 8–9; ECF No. 141-12. Betty was the primary beneficiary of the JDB Life Insurance Trust, and the Buckingham children were made contingent beneficiaries who would receive the remaining balance of the trust after the death of both parents. ECF No. 120-1 at 9.

United Bank claims that SCS retained the power to change the policy beneficiaries, despite the status of the John Hancock policies as split dollar policies, and that John's designation of his wife, Betty, as the secondary beneficiary was done in John's capacity as president of SCS. ECF No. 141-1 at 4. As such, United Bank argues that SCS was the alternate beneficiary of the split dollar and John Hancock policies and John's estate was the alternate beneficiary of the JDB policies. *Id.* at 3–4. Therefore, it contends, but for David's actions

---

[2] The final order incorrectly states the date as January 13, 2010, instead of January 13, 2011. ECF No. 120-4.

changing the beneficiary designations, SCS and John's estate would have been the beneficiaries of the policies at John's death, and thus the proceeds were diverted away from SCS's and John's creditors. Hr'g Tr. 4:14:25-4:15:10 (Nov. 27, 2017); *see also* ECF No. 141-1 at 29.

*The John Hancock Policies and the Osprey Trust*

As the cost of managing John's illness increased, David prepared an application for accelerated death benefits on the John Hancock policies, "to provide funds for his mother's support and meet the extraordinary cost of John's care." ECF No. 120-1 at 9. Eventually, an agreement was made between SCS (which had stopped paying the premiums on the John Hancock policies) and David to sell the policies to John, through David as guardian. *Id.* at 9–10. In November 2011, David created the Osprey Trust, which was empowered to seek accelerated death benefits on the John Hancock policies. *Id.* at 10. The directors of SCS—John, acting through David as his guardian, Betty, and Thomas—voted to sell the John Hancock policies to the Osprey Trust for $110,000, the value determined by John Hancock pursuant to an IRS formula. *Id.*; ECF No. 120-7. When the sale was complete, David paid the overdue premiums to reinstate the policies and restore the death benefits. ECF No. 120-1 at 10. David then, as John's guardian and trustee of the Osprey Trust, requested accelerated death benefits. *Id.* He continued, in his role as Osprey Trust trustee, to pay the policy premiums as they became due for the remainder of John's life. *Id.*

*The JDB and Split Dollar Policies and the Blue Heron Trust*

On December 7, 2011, Betty unexpectedly died before John. *Id.* Because the JDB Life Insurance Trust had been established to provide funds for Betty's support in the expectation that John would predecease her, David, acting as John's guardian, changed the beneficiary of the

JDB and split dollar policies from the now-outdated JDB Life Insurance Trust to the newly-created Blue Heron Trust. *Id.*; ECF No. 141-12.

*The Montgomery County Litigation*

During 2011, after finding out about the Second Amendment, David decided to challenge the validity of the assignments of the JDB and the split dollar policies based on John's mental incompetency. ECF No. 120-1 at 11. In May 2012, David, as John's guardian, filed suit against VCB in the Circuit Court for Montgomery County seeking a declaratory judgment voiding the Second Amendment. *Id.* A five-day bench trial took place in November 2013. *Id.*

Ultimately Judge Dugan found that (1) VCB had been told in early 2010 that John was suffering from advanced dementia, (2) VCB's counsel had suggested that VCB ask John to undergo a medical examination before signing any legal documents, and (3) VCB ignored its counsel's advice and obtained John's signature on the Second Amendment. ECF No. 120-11 at 38–41; ECF No. 120-12. Based on this evidence and expert testimony from physicians who examined John in 2009 and 2010, Judge Dugan held that by May 2010 John was not able to understand legal documents, was not mentally or legally competent, and that VCB had been aware of John's incapacity in advance of the Second Amendment transaction. ECF No. 120-11 at 38–41; ECF No. 120-12 at 3–5. Judge Dugan also found, and VCB did not dispute, that some of John's signatures had been forged on the Second Amendment. ECF No. 120-11 at 42; ECF No. 120-12 at 3–4. Accordingly, Judge Dugan declared the Second Amended Forbearance Agreement void. ECF No. 120-11 at 41; ECF No. 120-12 at 3–5. As such, the assignments of the JDB and split dollar policies to VCB were void.[3] ECF No. 120-12 at 3–4.

_____

[3] The Circuit Court denied United Bank's motion for reconsideration or a new trial. *Buckingham, et al. v. Va. Commerce Bank, N.A., et al.*, No. 363481-V (Md. Cir. Ct.), Dkt. No. 270. United Bank filed an appeal, Dkt. No. 289, which is pending in the Court of Special Appeals of Maryland and is scheduled for argument on April 11, 2018.

*Payment of the Death Benefits Under the Policies*

On October 17, 2012, John died. ECF No. 120-1 at 12. Northwestern Mutual paid the death benefits on the split dollar policies to the Blue Heron Trust, in accordance with the Ownership Agreements, and paid the death benefits of the JDB policies, totaling $1,036,453.14, into the registry of the Circuit Court.[4] *Id.*; ECF No. 120-14. Amounts received as accelerated death benefits on the two John Hancock policies were repaid by deduction from the death benefits in accordance with the policy terms. ECF No. 120-1 at 12. All amounts borrowed against the cash value of the split dollar policies by SCS were repaid by deduction from the death benefits in accordance with the ownership agreements. *Id.*; ECF No. 120-14. Because SCS had borrowed more on the split dollar policies than it had paid in premiums, there were no proceeds to be paid to VCB from SCS's ownership of the split dollar policies. ECF No. 120-14.

## 2. Procedural History

On October 30, 2013, VCB filed the original Complaint in this case against David, individually and in his capacity as trustee of the Osprey Trust and the Blue Heron Trust, Susan Buckingham ("Susan"), David's sister, individually and as personal representative of John's estate, and Richard Buckingham, David's brother, individually and as personal representative of John's estate (collectively, the "Defendants").[5] ECF No. 1. On August 18, 2017, United Bank, as VCB's successor by merger, filed a Second Amended Complaint ("SAC"). ECF No. 126. The SAC contains eight counts: (1) Count I alleges a violation of the Maryland Uniform Fraudulent Conveyance Act ("MUFCA"), Md. Code Ann., Com. Law, §§ 15-201, *et seq.*, for the transfer of ownership and beneficiary interest in the John Hancock policies; (2) Counts II–V

---

[4] The Circuit Court ordered that the money remain in the Court Registry until further court order because of the pending litigation in this Court. ECF No. 120-12 at 5.
[5] Richard filed for Chapter 7 Bankruptcy on August 5, 2013, and this Court issued an Order staying proceedings against him individually on November 27, 2013. ECF No. 6.

allege violations of the MUFCA for changes in the beneficiary designations of all of the policies; (3) Count VI alleges self-dealing by David regarding all of the policies; and (4) Counts VII and VIII seek declaratory judgment that David's creation of the Osprey Trust and Blue Heron Trust was invalid and the transfers of the policy interests to those trusts were void *ab initio*. *Id.*

On July 31, 2017 and September 8, 2017, David and Susan filed Motions for Summary Judgment (ECF Nos. 120, 121, 137) that are now before this Court for decision. On September 29, 2017, United Bank filed its Response to Defendants' Motions for Summary Judgment and its own Motion for Summary Judgment. ECF No. 141. Defendants filed their Response to United Bank's Motion for Summary Judgment and their Reply to United Bank's Response to their Motions for Summary Judgment on October 13, 2017. ECF No. 144. United Bank filed its Reply to Defendants' Opposition to its Motion for Summary Judgment on October 27, 2017. ECF No. 146. A hearing on all pending motions was held on November 27, 2017.

### 3. Standard of Review

Summary judgment is proper under Federal Rule of Civil Procedure 56(a) if there is no genuine dispute over any material facts, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A dispute of material fact is genuine if the evidence would allow the trier of fact to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court may only rely on facts supported in the record, not assertions made in the pleadings. *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). Moreover, the court must view all facts and make all reasonable inferences in the light most favorable to the nonmoving party. *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must present more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact that would preclude summary judgment. *Anderson*, 477 U.S. at 252.

### 4. Unclean Hands Doctrine

This case provides a prime example of what the unclean hands doctrine is intended to prevent. United Bank is attempting to assert a right to the proceeds of the life insurance policies that it failed to secure through the now voided assignments in the Second Amendment. That failure was the result of the grossly inequitable conduct of its predecessor, VCB. This Court cannot now permit United Bank to accomplish through another route that which it tried and failed to do through unsavory means.

By "den[ying] relief to those guilty of unlawful or inequitable conduct with respect to the matter for which relief is sought," the unclean hands doctrine "prevent[s] the court from assisting in fraud or other inequitable conduct . . . ." *Turner v. Turner*, 809 A.2d 18, 58 (Md. Ct. Spec. App. 2002) (citation omitted). Although the unclean hands doctrine originated in equity, Maryland courts now apply the doctrine to actions at law, including statutory claims. *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103, 106 (D. Md. 1989); *Manown v. Adams*, 598 A.2d 821, 825 (Md. Ct. Spec. App. 1991), *vacated on other grounds*, 615 A.2d 611 (Md. 1992). The Court generally has "broad discretion in determining whether and how to apply" the doctrine, but there must be a sufficient "nexus between the misconduct and the transaction" at issue to justify application. *Mona v. Mona Elec. Group, Inc.*, 934 A.2d 450, 476–77 (Md. Ct. Spec. App. 2007) (quoting *Smith*, 124 F.R.D. at 107; *Turner*, 809 A.2d at 58) (holding sufficient nexus between plaintiff's representations in tax forms guaranteeing advances made to defendant and subsequent denial of personal responsibility for the same advances because both related to the advances).

The focus of the doctrine is "not that the plaintiff's hands are dirty, but that [the plaintiff] dirties them in acquiring the right [the plaintiff] now asserts." *Id.* at 477 (internal quotation marks and citations omitted). A court may grant a motion for summary judgment based on the unclean hands doctrine "if there is no material dispute of fact that plaintiff's misconduct is directly related to the relief now sought by the plaintiff." *Sky Angel U.S., LLC v. Discovery Comm'ns, LLC*, 95 F. Supp. 3d 860, 880–81 (D. Md. 2015) (citing *Hicks v. Gilbert*, 762 A.2d 986, 989 (Md. Ct. Spec. App. 2000)).

United Bank argues that application of the unclean hands doctrine is inappropriate because there is no sufficient nexus between the impropriety found by the Circuit Court and the transactions at issue here. ECF No. 141-1 at 32. United Bank asserts that the Second Amendment, if it had been determined valid, would have provided to VCB the status of a secured creditor, but it is not now asserting its right to the proceeds as a secured creditor, but only as an unsecured creditor. *Id.* Any misconduct on VCB's part that led to the invalidation of the Second Amendment, it argues, has nothing to do with the claims it makes here as an unsecured creditor. *Id.*

United Bank asserts that the doctrine should only be applied when the alleged improper conduct is the source of the claim in the second case. For this proposition, United Bank cites to *Schneider v. Schneider*, 624 A.2d 1319, 1325 (Md. Ct. Spec. App. 1993), in which the court found that the plaintiff's perjury was the source of her equitable claim in the subsequent case against the defendant, and thus the trial court was within its discretion in applying the doctrine. That case is inapplicable, however, because it was reversed by the Court of Appeals of Maryland based on that court's finding that application of the unclean hands doctrine was inappropriate. *Schneider v. Schneider*, 644 A.2d 510, 514–15 (Md. 1994). The Court of Appeals held that the

more appropriate doctrine that the lower court should have applied under the circumstances was *in pari delicto* (where fault is mutual), and thus it reversed on those grounds and made no determination related to the unclean hands doctrine. *Id.* at 514–15, 518. United Bank does not provide any other authority in support of its argument.

The more helpful and relevant case, cited by Defendants, is *Mona v. Mona Electric Group, Inc.*, 934 A.2d 450 (Md. Ct. Spec. App. 2007). In that case, the Court of Special Appeals of Maryland affirmed the lower court's application of the unclean hands doctrine where the plaintiff, a minority shareholder, sued Mona Electric Group to recover money deducted by the company from a dividend payment. *Mona*, 934 A.2d at 478. The plaintiff had prevailed at trial based on his testimony denying that he had made any personal guarantees of repayment for advances paid by Mona Electric Group, which the dividend deduction had been intended to recoup. *Id.* However, the plaintiff admitted that he had deducted the amount of the advance on his taxes by representing that he had personally guaranteed repayment. *Id.* In post-trial proceedings, the trial court *sua sponte* determined that the unclean hands doctrine should apply because the prior conduct and the present relief both concerned the advances. *Id.* What was important was that the plaintiff was trying to achieve a particular result—avoidance of liability to repay the advances—based on his misconduct. Accordingly, the trial court reduced the plaintiff's recovery by the amounts advanced. *Id.*

The "nexus between the misconduct and the transaction" in *Mona* was that they both concerned the amounts advanced. Here, the nexus between the misconduct and the transaction is that they both concern the proceeds of the disputed life insurance policies. In *Mona*, as here, the plaintiffs tried to collect the disputed money through inequitable conduct. The fact that United Bank is now asserting its claim to the money as an unsecured creditor (and is thus not using the

rights the Second Amendment would have provided to it had it not been invalidated) does not alter the analysis. There is no material dispute of fact that the subject matter and the result desired are the same now as they were in 2011. The very reason United Bank initiated this lawsuit is because the Second Amendment was deemed void by the Circuit Court, and thus VCB could not reach the disputed insurance policies. This Court cannot ignore VCB's previous inequitable conduct in its effort to reach the same insurance proceeds and now allow its successor by merger, United Bank, to recover as to the same subject matter in the wake of that misconduct. By way of protecting its judicial integrity, the Court will therefore apply the unclean hands doctrine to bar United Bank's recovery in this case. Accordingly, the Court will grant summary judgment for Defendants on all counts. However, even if the unclean hands doctrine did not apply in this case, Defendants would still prevail under applicable law.

### 5. Counts I–V: Maryland Uniform Fraudulent Conveyance Act

### A. Fair Consideration for the Sale of the John Hancock Policies

Count I of the SAC alleges that David violated the MUFCA with respect to the John Hancock policies by changing the beneficiary designations of the policies and by transferring the ownership of the policies from SCS to himself as trustee of the Osprey Trust. ECF No. 126, ¶ 40. David asserts that Defendants are entitled to summary judgment as to Count I because, notwithstanding SCS's insolvency at the time of the transaction, the purchase of the John Hancock policies by the Osprey Trust was done for fair consideration and thus is not a fraudulent conveyance as a matter of law. ECF No. 120-1 at 17.

Under the MUFCA,

Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

Md. Code Ann., Com. Law § 15-204 (West 2017). "Fair consideration" is provided in exchange for property or an obligation if:

> (1) In exchange for the property or obligation, as a fair equivalent for it and in good faith, property is conveyed or an antecedent debt is satisfied; or
> (2) The property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared to the value of the property or obligation obtained.

*Id.* § 15-203.

As of 2008, the John Hancock policies were made split-dollar policies: SCS was named the primary beneficiary of death benefits to the extent of premiums it paid, and Betty was the beneficiary to receive the remaining balance of death benefits. ECF No. 120-15. Accordingly, at the time before the policies were sold in October 2011, United Bank would have been entitled to $280,000—presumably the amount SCS paid in premiums, although that amount alleged in the SAC is not substantiated by evidence in the record. *See* ECF No. 126, ¶ 42. David asserts that the $110,000 price paid for the policies to SCS was fair consideration because the "policies had long overdue premiums, negative surrender value, and were in danger of lapsing and becoming worthless." ECF No. 144 at 6. SCS had declared bankruptcy in December 2010 and had no funds from which to pay the policy premiums. *Id.*

United Bank contends that it would have permitted SCS to pay the premiums pursuant to a Consent Order for use of cash collateral in the bankruptcy case. ECF 141-1 at 25 (citing ECF No. 141-30 (Consent Order)). Yet, as David points out, the Consent Order says nothing about paying insurance premiums and, regardless, the Consent Order was set to expire no later than March 2011. *Id.*; *see also* ECF No. 141-30, ¶ 11. Furthermore, documents from John Hancock show that SCS had stopped paying the policy premiums before December 2010 and that both policies had a $0.00 surrender value as of March 2010. ECF No. 141-11. Additionally,

David argues, because it was difficult for all the parties to determine the policies' fair market value, it was reasonable to adopt the calculation done by John Hancock, a neutral third party, based on an IRS-approved formula that was used to determine the valuation of the policies as they would be valued as a gift or estate tax. ECF No. 144 at 8.

United Bank asserts that because the Osprey Trust, upon obtaining ownership of the policies, received in return for the $110,000 "the right to draw down immediately in cash one half of each policy's total death benefit, which totaled $750,000," the fair market value for the policies was significantly closer to $750,000. ECF No. 141-1 at 28. In support it provides a letter to David from John Hancock explaining the amount of reduced death benefits of the two policies, which comes out to be about $709,000. ECF No. 141-24. United Bank also cites to a Tax Court case for support that "[t]he nearer the insured approaches death, which is the event of collectability, the nearer its value approaches the face amount for which [the policy] was issued." *Pritchard v. Comm'r of Internal Revenue*, 4 T.C. 204, 208 (1944) (finding cash surrender value inadequate as measure of policy worth where policy's value would be received in shorter time than mortality tables predicted).

There is no dispositive authority as to how fair consideration is determined under specific circumstances. Therefore, under the circumstances here—SCS had not been paying the policies' premiums, SCS was insolvent, and the policies had a cash surrender value of $0.00—the Court agrees with Defendants' analysis and finds that the $110,000 was a "fair equivalent" for the John Hancock policies. Accordingly, even if the unclean hands doctrine does not apply in this case, the Court will grant summary judgment for Defendants as to Count I because the transfer of ownership of the John Hancock policies did not violate the MUFCA.

**B. Definition of "Conveyance" Under the MUFCA**

United Bank alleges in Counts II–V of the SAC that David violated the MUFCA by changing the beneficiary designations on each of the policies for the purpose of removing those policies from John's and SCS's estates and thus from VCB's reach as a creditor. ECF No. 126, ¶¶ 49–74. The Court, however, need not examine each of the transactions to determine if they were indeed fraudulent under the statute because a change of the designated beneficiary of a life insurance policy does not constitute a "conveyance" under the MUFCA.

Under the MUFCA, a "conveyance" is defined as "includ[ing] every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." Md. Code Ann., Com. Law § 15-201(c) (West 2017). Thus, the relevant inquiry is whether a life insurance policy beneficiary designation creates a property interest under the MUFCA. No Maryland court has addressed that specific question. The Court of Appeals of Maryland has held in other contexts, however, that the status as a beneficiary of a life insurance policy creates only a mere expectancy, not a property interest. In *Wooddy v. Wooddy*, 265 A.2d 467, 473 (Md. 1970), the Court of Appeals rejected a claim by a former wife that her children were entitled to a constructive trust over certain life insurance policies taken out by her former husband. The court held that

> the fact that [the former husband] may have at one time designated the children as beneficiaries or intended the policies to be used for [the children's] education does not, standing alone, create rights which may be asserted by the children or in their behalf to require him to keep the policies in force or to prevent him from changing the beneficiary he had designated.

*Wooddy*, 265 A.2d at 473. Similarly, the Court of Appeals in *Durst v. Durst*, 193 A.2d 26, 28 (Md. 1963), a case involving a former wife's claims to proceeds of her former husband's life insurance policy, stated that

> [w]e have uniformly held that where the right by the insured to change the beneficiary named in a life insurance policy is reserved, the beneficiary has no vested or indefeasible interest under the policy during the lifetime of the insured's death, but only a revocable expectancy contingent upon being the beneficiary at the time of the insured's death.

Accordingly, the court rejected the wife's argument that her status as beneficiary should be maintained. *Durst*, 193 A.2d at 28.

The Court of Special Appeals of Maryland reiterated this approach in *East v. PaineWebber, Inc.*, 748 A.2d 1082 (Md. Ct. Spec. App. 2000). In that case, a former wife contested whether she had waived her rights to receive proceeds of her former husband's IRA (which the former wife assumed that she had been the designated beneficiary at the time of the former husband's death) under a property settlement agreement in which the former wife quitclaimed any interest she had in the former husband's property. *East*, 748 A.2d at 1087–88. The court held that she had not waived her rights because, at the time she executed the agreement, she had no property interest in the IRA. *Id.* at 1088. "To be sure," the court explained, "she had an expectancy, but an expectancy is not a property interest. It is a mere hope or wish." *Id.*

Although these cases were not decided under the MUFCA, other state courts have applied the same principle to the question of fraudulent conveyances, both in jurisdictions that have adopted the Uniform Fraudulent Conveyance Act or its successor, *see, e.g.*, *Wornick v. Gaffney*, 544 F.3d 486, 492 n.3 (2d Cir. 2008) ("beneficiary holds only an inchoate interest in an insurance policy, merely changing a beneficiary cannot be considered a conveyance of property capable of being fraudulent"); *First Wis. Nat'l Bank of Milwaukee v. Roehling*, 269 N.W. 677, 680 (Wis. 1936) ("[t]he Uniform Fraudulent Conveyance Act evidences no intent to protect the creditors against the loss by transfer of an interest so speculative, so remote, and so completely

within the power of the insured to destroy"), and jurisdictions that have not adopted the uniform statute, *see, e.g.*, *Weber v. Lincoln Nat'l Life Ins. Co.*, No. 2:13CV31, 2013 WL 5530257, at *8 (E.D. Va. Oct. 2, 2013) (benefits of unmatured life insurance policy are not property under Virginia's non-uniform fraudulent conveyance statute); *Mahood v. Maynard*, 171 S.E. 884, 884 (W.V. 1933) (beneficiary interest in proceeds of life insurance policy is a future contingency under state common law).

David urges the Court to extend Maryland's precedent that a beneficiary designation is only an expectancy, and not a property interest, to the context of the MUFCA, as other states have done. Accordingly, he argues that changes in the beneficiary designations of all eight life insurance policies done before John's death were not conveyances under the statute because they did not involve a property interest.

United Bank, for its part, argues that at the time of the changes, the then-existing beneficiaries, and thus United Bank as a creditor, had more than a mere expectancy. ECF No. 141-1 at 22. It asserts that upon the declaration of John's incompetence, the beneficiary designations under the split-dollar and JDB policies became fixed because "John was divested of the ability to change them (by virtue of being declared incompetent), and David did not have the ability to change them (at least without court approval)." *Id.* at 22–23. Therefore, it argues, because SCS was the alternate beneficiary in the event that the original beneficiary, Betty, predeceased John, which is what happened, SCS would have been the beneficiary of these policies at the time of John's death. *Id.* Accordingly, United Bank, as SCS's creditor, asserts that it was entitled to the proceeds which would have been part of SCS's and John's estates. *Id.*

Assuming that David had proper authority to make the beneficiary designation changes and SCS would have been the proper beneficiary at the time of John's death, United Bank's

argument falls flat. It first relies upon a decision of the United States Bankruptcy Court for the District of Columbia that, explicitly rejecting the contrary holding of other courts, stated "that a change in beneficiary is subject to a fraudulent conveyance action by any creditor who would have had an interest in the proceeds but for the transfer." *In re Wolensky's Ltd. P'ship*, 163 B.R. 615, 627 (Bankr. D.D.C. 1993). In *In re Wolensky*, the Bankruptcy Court held that an insurance policy is still an asset to which a creditor is entitled, even though it is contingent and perhaps of nominal value. *Id.* Because the debtor was the original beneficiary under the policy, the Bankruptcy Court ruled that the creditors would have been entitled to the proceeds had the designation not been changed. *Id.* These conclusions, however, were all dicta because the court ultimately held the change in beneficiary was invalid for other reasons and thus did not need to make a holding regarding whether the change, if valid, would have been a fraudulent conveyance. *Id.* 627–29. Furthermore, the District of Columbia had not adopted the Uniform Fraudulent Conveyance Act or its successor at the time of the decision, and opinions of the United States Bankruptcy Court for the District of Columbia are not, in any event, binding on this Court.

United Bank also cites to another Bankruptcy Court case, this one from the Western District of Pennsylvania, that held that under the Pennsylvania Fraudulent Conveyance Act the definition of "conveyance," which is the same definition under the MUFCA, includes a change of a beneficiary designation. *In re John Hatton, Inc.*, 104 B.R. 705, 707–08 (Bankr. W.D. Pa. 1989) (holding debtor's change of beneficiary designation on life insurance policy from himself to wife after being diagnosed with lung cancer was a fraudulent conveyance). This case, however, is contrary to Maryland precedent, and that of other sister states, that insurance beneficiary interests are mere expectancies.

The only Fourth Circuit case cited by United Bank is *Navassa Guano Co. v. Cockfield*, 253 F. 883 (4th Cir. 1918). In that case, the Fourth Circuit found a change in an insurance beneficiary designation a fraudulent conveyance under the Statute of Elizabeth, the MUFCA's early precursor statute, where the insured changed the beneficiary knowing death was imminent. *Navassa*, 253 F. at 886. The age of that case, which involved a South Carolina transaction, limits its influence as does Maryland's later development of its legal precedent regarding life insurance benefits as mere expectancies, and not property interests.

Although the Court of Appeals of Maryland has not yet weighed in on this specific issue, the state's precedent and its sister courts' influence strongly cut in favor of extending the courts' treatment of the right to a life insurance benefit as a mere expectancy, and not a property interest, to the context of the MUFCA. Accordingly, even if the unclean hands doctrine does not apply in this case, the Court will grant summary judgment in favor of Defendants as to Counts II–V because it concludes that a change in a life insurance beneficiary designation is not a "conveyance" under the MUFCA, and thus the statute is not applicable.

### 6. Count VI: Self-Dealing

Count VI of the SAC claims that David, as John's guardian, breached the fiduciary duty he owed to SCS's creditors and the creditors of John's future estate. ECF No. 126, ¶¶ 75–79. David asserts that the Defendants are entitled to summary judgment on this count because, under Maryland law, corporate directors only owe fiduciary duties to the corporation and, in very limited circumstances, its shareholders. ECF No. 120-1 at 25–26.

It is settled law in Maryland that a corporate officer only owes a fiduciary duty to the corporation regarding management of the corporation's affairs. *See* Md. Code Ann., Corps. & Ass'ns § 2-405.1(g); *George Wasserman & Janice Wasserman Goldsten Family, LLC v. Kay*,

14 A.3d 1193, 1206 (Md. Ct. Spec. App. 2011). In the limited circumstances of cases affecting fundamental shareholder rights, a corporate officer may owe a fiduciary duty to a shareholder. *Kay*, 14 A.3d at 1207. But, as the Court of Appeals of Maryland has plainly stated, a corporate officer does not owe a fiduciary duty to creditors. *Waller v. Waller*, 49 A.2d 449, 452 (Md. 1946) ("When directors commit a breach of trust, they are liable to the corporation, not to its creditors or stockholders."); *see also Danielewicz v. Arnold*, 769 A.2d 274, 283 (Md. Ct. Spec. App. 2011) (holding that this principle is "well-settled law"). Therefore, because VCB was a creditor of SCS's and John's estates—not a shareholder of SCS—there is no premise on which United Bank can assert a breach of fiduciary duty by David, in his capacity as John's guardian, regarding the actions taken as a SCS corporate director.

United Bank argues that the above well-settled law is only true when the corporation is solvent. ECF No. 141-1 at 30 (citing *Pritchard v. Myers*, 197 A. 620, 625–26 (Md. 1938) ("Should, however, the corporation be insolvent and contemplating the liquidation of its affairs, its directors become bound as trustees for all the creditors and stockholders, and must so use, conserve, and apply the corporate property.")). If a corporate director breaches a duty under those circumstances, United Bank asserts that creditors may sue so long as the creditors "allege and show that they have suffered loss by reason of the wrongs complained of, and that the corporation or receiver has failed or refused to take the proper steps for the redress of the wrong." *Id.* at 30–31 (quoting *Pritchard*, 197 A. at 626). Given this, United Bank argues that it is at least a dispute of a material fact whether, given SCS's poor economic position at the time of the transfers, David, while acting as a corporate director in his capacity as John's guardian, owed a fiduciary duty to VCB. ECF No. 141-1 at 31.

*Pritchard*'s applicability, however, is much narrower than suggested by United Bank. In that case, the insolvent corporation was in receivership as established through official equity proceedings, and the receiver had refused to initiate action against the corporation's directors for the benefit of its depositors and creditors. *Pritchard*, 197 A. at 622, 626. Although SCS did go through bankruptcy, the analogy fails because the creditors here cannot show that at the time of insolvency "the corporation or receiver ha[d] failed or refused to take the proper steps for the redress of the wrong," which would be a necessary showing for the case to move forward, even assuming a cause of action by a creditor exists. Accordingly, United Bank cannot challenge David's conduct in his role as John's guardian as a violation of a fiduciary duty owed to VCB. As such, the Court will grant summary judgment in favor of Defendants as to Count VI.

**7. Counts VII and VIII: Standing to Challenge David's Authority as John's Guardian**

Count VII of the SAC seeks a declaratory judgment that the changes in life insurance beneficiary designations made by David, in his capacity as John's guardian, were void *ab initio* because David lacked the authority to create the trusts that were ultimately designated as beneficiaries. ECF No 126, ¶¶ 80–90. Count VIII seeks declaratory judgment that the transfer of ownership of the John Hancock policies was void *ab initio* because David lacked authority to create the Osprey Trust, which bought the policies, and to cast John's vote as director of SCS. *Id.* ¶¶ 91–98. Both allegations fail because United Bank lacks standing to challenge the transactions.

Under the federal Declaratory Judgment Act, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (2012). In the Fourth Circuit, two conditions must be met for a court to

have jurisdiction to issue a declaratory judgment: "First, the dispute must be a 'case or controversy' within the confines of Article III of the United States Constitution—the 'constitutional' inquiry. Second, the trial court, in its discretion, must be satisfied that declaratory relief is appropriate—the 'prudential' inquiry." *White v. Nat'l Union Fire Ins. Co.*, 913 F.2d 165, 167 (4th Cir. 1990).

David argues that United Bank lacks standing to challenge his authority as John's guardian because it had no justiciable interest in the guardianship proceeding and thus did not suffer any injury-in-fact, an Article III standing requirement, from any alleged unauthorized action taken by David. ECF No. 137-1 at 5. Under Maryland law, a guardian only owes duties to his ward and "interested persons" as defined under the guardianship statute. Md. Code Ann., Est. & Trusts § 13-216(a) (West 2017). Because United Bank's status as creditor does not qualify it as an "interested person" in John's guardianship, David asserts, it was not harmed by any alleged unauthorized conduct taken by David in his capacity as John's guardian. *Id*. Finally, David argues that United Bank was not a party to any of the transactions in which his authority is challenged, and thus did not suffer an injury as a result of those transactions. *Id*.

United Bank, however, argues that its ability to challenge David's authority stems from its request for declaratory judgment, and not from an interest in John's guardianship. To make its point, United Bank cites to *White v. National Union Fire Insurance Co.*, 913 F.2d 165 (4th Cir. 1990). In that case, the Fourth Circuit upheld the district court's exercise of jurisdiction in issuing declaratory relief as to the amount of uninsured motorist insurance coverage available to the plaintiff under her employer's insurance policy to cover an accident in which she was acting within the scope of her employment. *White*, 913 F.2d at 165. The court found that the jurisdictional requirements were met because the judgment provided plaintiff with guidance as to

the amount of uninsured motorist insurance coverage available to her if she were to obtain a judgment against the other driver. *Id*. at 168. In that case, the plaintiff was not a party to the insurance contract at issue, but the court still found declaratory judgment appropriate. United Bank argues that the Court should follow the Fourth Circuit's example in that case and find that declaratory judgment for United Bank, as a third party, is appropriate where, as here, a declaratory judgment would allegedly provide conclusive relief by resolving the continuing dispute. ECF No. 146 at 3.

In making the above argument, United Bank contends that it is not seeking declaratory judgment as an "interested party" in John's guardianship, as David claims, but is "challenging David's actions as an individual who intended to hinder, delay and defraud Plaintiff by wrongfully using his guardian status to accomplish a wrongful purpose." *Id.* at 2. Furthermore, United Bank asserts it has standing "to request that the Court enforce the equitable maxim that equity will not allow a statute to be used as a cloak for fraud." *Id*. at 2 n.2 (citing *Citizens Nat'l Bank v. Leffler*, 228 Md. 262, 270 (1962)).

United Bank, however, fails to contend with the fact that declaratory judgment is only a procedural remedy, and does not create any substantive rights. *Aetna Life Ins. Co v. Haworth*, 300 U.S. 227, 240 (1937). This means that a party is not entitled to a declaratory judgment on an issue for which he is not entitled to substantive relief. Here, United Bank is not entitled to substantive relief by challenging David's authorization for his conduct as John's guardian. Md. Code Ann., Est. & Trusts § 13-216(a) ("If the [guardian's] exercise of a power is improper, the guardian is liable for breach of his fiduciary duty to the minor or disabled person or to interested persons . . . ."). This does not leave United Bank without recourse because it has asserted its claims under the MUFCA, which provides a mechanism for United Bank to

challenge David's alleged conduct "as an individual who intended to hinder, delay or defraud Plaintiff . . . ." But, declaratory judgment does not allow United Bank to challenge that conduct under a premise of unauthorized guardianship action because it would not be able to do so under substantive Maryland law. Accordingly, the Court will grant summary judgment for Defendants on Counts VII and VIII because United Bank lacks proper standing to challenge the disputed transactions based on the scope of David's authority as John's guardian.

## 8. Conclusion

The bad behavior of United Bank's predecessor sunk its ship in the Circuit Court for Montgomery County. That behavior is fatal to its efforts in this Court, and its soiled hands preclude any recovery here as well. United Bank's interesting legal theories are not sufficient to raise its sunken ship because they are wrong as a matter of law. Thus, even with clean hands, its ship will remain at the bottom of the legal ocean.

Accordingly, Defendants' Motions for Summary Judgment (ECF Nos. 120, 121, 137) will be **GRANTED** and Plaintiff's Motion for Summary Judgment (ECF No. 141) will be **DENIED**. A separate order will follow.


Date: March 13, 2018         _____/s/_____
ROGER W. TITUS
UNITED STATES DISTRICT JUDGE