IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED BANK, | * | |
|    Plaintiff, | * | |
| v. | * | Civil Action No. 8:13-cv-03227-PX |
| RICHARD BUCKINGHAM, *et al.*, | * | |
|    Defendants. | * | |

***

## MEMORANDUM OPINION

Pending before the Court are cross motions for summary judgment filed by Plaintiff United Bank ("the Bank"), ECF No. 168, and Defendants David and Susan Buckingham ("the Buckinghams"), ECF No. 170. At the Court's request, the parties have additionally submitted letter pleadings addressing whether the Court should certify questions of law to the Maryland Court of Appeals. ECF Nos. 182, 184. The motions are fully briefed, and the Court finds that no hearing is necessary. *See* Loc. R. 105.6. For the reasons that follow, the Court certifies two questions, pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 12-601 *et seq.* and STAYS this case pending action from the Maryland Court of Appeals.

**I.    Background[1]**
    **A. Facts**

This clash between the Buckingham family and the creditors of the family's deceased patriarch, John Buckingham, has now lasted more than a decade, and has played out in both state and federal court. The crux of the dispute before this Court concerns whether diversion of the proceeds from several life insurance policies, which were among the sole remaining assets of

---
[1] The Court provides the following statement of facts and procedure pursuant to Md. Code Ann., Cts. & Jud. Proc. § 12-606(a). The Court notes the parties' factual disagreements as evident from the pending motions for summary judgment.

John Buckingham and the family company, Sun Control Systems ("SCS"), was done to defraud the Bank and other creditors. Although the background of this case has been repeated and reframed time and again, the Court summarizes the matter here to aid the Maryland Court of Appeals.

John Buckingham founded SCS in 1979 and acted as President and as a Director on its board until 2009. ECF No. 120-19 ¶¶ 3, 12–13. John was married to Elizabeth "Betty" Buckingham, and together they had five children: David, Susan, Thomas, Daniel, and Richard Buckingham. *Id*. ¶¶ 4–8.

In 2008, John was diagnosed with dementia and, in 2009, this diagnosis was confirmed to be both progressive and terminal. *Id.* ¶¶ 15–16. Around this time, Thomas Buckingham was designated to succeed John as President of SCS, although John stayed on as a Director and was never removed from the Board. ECF No. 120-16 ¶ 8; ECF No. 120-19 ¶¶ 6, 12–13.

By January 2010, John's condition had worsened. He was sometimes found wandering his neighborhood or in his neighbors' homes eating from their refrigerators. ECF No. 120-16 ¶ 7. In August 2010, Betty Buckingham filed a petition for guardianship in the Circuit Court for Montgomery County. ECF No. 120-19 ¶ 17. Betty was appointed guardian of John's person, and David was appointed both temporary co-guardian of John's person and sole guardian of John's property. *Id.*; ECF No. 120-2 at 2. In December 2010, the guardianship order was amended to make David solely the guardian of the property and Betty the temporary guardian of John's person. ECF No. 120-19 ¶ 17; ECF No. 120-3. In January 2011, the Circuit Court issued a final guardianship order that announced David and Betty as the co-guardians of John's person and maintained David's status as sole guardian of the property. ECF No. 120-19 ¶ 17; ECF No. 120-4 at 2. This order governing the guardianship of the property states that the guardian shall

have "all powers and duties set forth in Md. Code Ann., Est. & Trusts § 13-214 and § 15-102." ECF No. 120-4 at 2.

As John's mental health declined, so did SCS's financial health. SCS's revenues fell from $15.4 million in 2006 to $8.5 million in 2009. ECF No. 120-18 at 6. As of mid-2009, SCS had defaulted on loans it had secured with Virginia Commerce Bank ("VCB"), the Bank's predecessor, and owed over $5 million to VCB. ECF No. 141-30. John and Betty were also personally indebted to VCB as they had on occasion guaranteed loans to SCS and had also taken out loans in their personal capacity through a home equity line of credit. ECF No. 120-1 at 5; *see* ECF No. 120-18 at 2; ECF No. 141-22 at 2.

In May of 2009, SCS entered into a forbearance agreement with VCB. In the forbearance agreement, VCB agreed to refrain from collection and to increase SCS's line of credit by $750,000 in exchange for SCS's commitment to meet a specified schedule of payments. ECF No. 120-18 at 3–4. SCS's financial situation did not improve, however, and by 2010, SCS had defaulted on the forbearance agreement as well. ECF No. 120-1 at 7; ECF No. 141-22. VCB, now fearful that it would lose millions of dollars through its loans to SCS, began looking to SCS's remaining assets, among them the death benefits on eight life insurance policies in John's name that are the subject of this litigation. ECF No. 120-18 at 6.

These life insurance policies generally fall into three groups: (1) two policies from Northwestern Mutual (the "JDB policies") that John had purchased and for which he paid the premiums, ECF No. 120-19 ¶ 21; (2) four policies purchased by SCS from Northwestern Mutual (the "split dollar policies") under a "split dollar" arrangement where John named the beneficiaries but SCS "owned" the policies, paid the premiums, and upon John's death stood to recoup the premiums from the death benefits, with the remainder being paid to John's designated

3

beneficiary, *id*. ¶ 22–23; ECF No. 120-5; and (3) two policies from John Hancock (the "John Hancock Policies") purchased and owned by SCS and operated under a similar split dollar arrangement, with SCS recouping the premiums upon John's death. ECF No. 120-19 ¶ 24, ECF No. 120-15 at 2–3.

In June 2010, as John's health declined, VCB entered into a second forbearance agreement in which VCB obtained a secured interest in death benefits payable under the JDB and split dollar policies. ECF No. 120-17 at 9. The effect of this agreement was to give VCB a superior position to any SCS funds, including the life insurance benefits, upon John's death.

Prior to executing the second forbearance agreement, VCB had learned of John's dementia. ECF No. 120-11 at 3–5. Outside counsel advised VCB that before entering into the second forbearance agreement, John should undergo a competency evaluation. *Id.* at 7–11. VCB did not heed this advice. *Id.* at 14. Instead, VCB entered into a fully executed second forbearance agreement. It eventually came to light that some of John's signatures on this agreement were forged. *Id.* at 17. VCB, for its part, denies having any knowledge about the forgeries. ECF No. 168-1 at 30 n.7.

David contends he first learned of the second forbearance agreement in February 2011 when, after much back and forth, VCB provided to David the underlying documentation. ECF No. 120-19 ¶¶ 25–27, 29. David realized that the second forbearance agreement was executed when John was suffering acutely from dementia. *Id.* ¶ 29. David also recognized certain of the signatures as forgeries. *Id.*

The next month, in March 2011, David, in his capacity as guardian of the property, changed beneficiaries on the eight life insurance policies to the newly-created John D. Buckingham Life Insurance Trust ("JDB Trust") with David, Susan, and Richard as Co-Trustees.

*Id.* ¶ 31; *see* ECF No. 120-14 at 3. David contends that he created the JDB Trust to fund the care necessary for Betty once John died. ECF No. 120-19 ¶ 31. David also made Betty the primary beneficiary and the Buckingham children contingent beneficiaries of the JDB Trust. *Id.*

David next took steps to obtain accelerated death benefits to be paid from the John Hancock policies into another new trust, the "Osprey Trust," "to provide funds for [his] mother's support and meet the extraordinary cost of [John's] care." ECF No. 120-19 ¶¶ 36, 41. However, SCS still was owed the amount it had paid in premiums under the split dollar arrangement, ECF No. 120-15, which at the time totaled $280,000, ECF No. 126 ¶ 46. Thus, if David were to obtain accelerated benefits, they could be subject to SCS's creditors such as VCB. David and Thomas knew as much; contemporaneous email correspondence between the brothers reflects their concern that "[t]he bank or other creditors w[ould] end up with those funds." ECF No. 141-16 at 3.

SCS's Directors at the time—Thomas, Betty and David—next agreed on behalf of SCS to sell the John Hancock policies to the newly-created Osprey Trust. ECF No, 120-19 ¶¶ 39–41. They approved the sale of the policies for $110,000 payable to SCS. *Id.* ¶¶ 41, 43; *see also* ECF No. 141-13. Then David, as Trustee of the Osprey Trust, promptly obtained accelerated death benefits on the John Hancock policies for roughly seven times the amount paid to the corporation, or $709,128.65. ECF No. 141-24.

According to the Bank, the sale of the policies to the Osprey Trust for a fraction of the policies' value amounted to a fraudulent ploy to shield the assets from John's creditors. ECF No. 168 at 13–16. As evidence of the fraud, the Bank emphasizes the disparity between the $110,000 sale price and the $709,000 in valuable accelerated benefits obtained. *Id.* The Buckinghams maintain that this sale was simply designed to provide funds to care for John and

5

Betty. ECF No. 170 at 29–32; ECF No. 120-19 ¶ 36. And as to the disparity between the sale price and the value of the accelerated death benefits, the Buckinghams counter that because SCS had stopped paying the premiums, the policies had a negative surrender value and were in danger of lapsing. ECF No. 120-19 ¶¶ 38–40; *see* ECF No. 120-7. Thus, the Buckinghams claim, it was fair and appropriate to use a well-established U.S. Treasury Formula to arrive at the $110,000 sale price. ECF No. 120-19 ¶ 40.

On December 7, 2011, Betty passed away unexpectedly. *Id.* ¶ 42. The JDB Trust—which again was the beneficiary of all eight life insurance policies—was now at least partially obsolete as the vehicle to provide for Betty's care upon John's death. *Id.* ¶ 44. Thus, David, in his role as John's guardian of the property, changed the beneficiary of the insurance policies, again naming another newly created trust, the Blue Heron Trust. ECF No. 120-1 at 10; ECF No. 120-19 ¶¶ 30, 44; ECF No. 141-12.

Shortly after, in May 2012, David sued VCB in Montgomery County Circuit Court seeking to invalidate the assignment of the JDB and split dollar policies on the grounds that VCB entered into the second forbearance agreement knowing that John was incompetent. ECF No. 120-19 ¶ 45; *see* 120-12 at 1–2. After a five-day bench trial in May 2013, the Honorable Michael Dugan invalidated the assignments, finding that John lacked the capacity to enter into the second forbearance agreement and VCB, acting contrary to counsel's advice, knew it. ECF No. 120-19 ¶¶ 45–46; ECF No. 120-11 at 13–16; ECF No. 120-12 at 3–5. The court additionally found that certain of John's signatures on the second forbearance agreement were forged. ECF No. 120-11 at 17; ECF No. 120-12 at 3–5. VCB's priority interest in the JDB and split dollar policies were thus voided. ECF No. 120-12 at 3–5.

On October 17, 2012, John passed away and the remainder of death benefits on the

6

policies were distributed. ECF No. 120-19 ¶¶ 47–48. The John Hancock policies had already been paid down fully as accelerated death benefits. *Id.* ¶ 48. Northwestern paid the death benefits on the split dollar policies into the Blue Heron Trust, and the death benefits on the JDB policies into the registry of the Circuit Court in light of the pending action against VCB. *Id.*; ECF No. 120-14 at 2. In the end, no funds were available to satisfy any of VCB's sizable, outstanding loans. ECF No. 120-19 ¶ 48; ECF No. 120-14 at 2.

### B. Procedural Background

On October 30, 2013, the Bank brought suit in this Court against each of the Buckingham children individually, Susan and Richard in their capacities as representative for John's estate, and David in his capacity as trustee for the Osprey and Blue Heron Trusts.[2] The Bank sought to invalidate both the sale of the John Hancock policies from SCS to the Osprey Trust, and the change in beneficiaries on the JDB and split dollar polices to David as Trustee of the Osprey and Blue Heron Trusts. ECF No. 126.

Counts I through III pertain to the sale of the John Hancock policies. Count I alleges that SCS, through its Directors and David as guardian of John's property, fraudulently conveyed both its ownership and beneficiary interest to the Osprey Trust in violation of the Maryland Uniform Fraudulent Conveyances Act, Md. Code Ann., §§ 15-201, *et seq.* ("MUFCA"). ECF No. 126 ¶¶ 39–47. In Count II, the Bank alleges that David fraudulently requested and received accelerated death benefits on the John Hancock policies and, as a result, caused those benefits to be paid into the Osprey Trust, also in violation of MUFCA. *Id.* ¶¶ 48–50. And in Count III, the Bank alleges that David's change of the beneficiary of the John Hancock policies from Betty to the Osprey

---

[2] Even though the Circuit Court had invalidated the second forbearance agreement which had given the Bank a superior position as a secured creditor against SCS and John's assets, the Bank still retained an interest in the assets as an unsecured creditor. ECF No. 161-1 at 6–7, 11.

7

Trust constituted yet another violation of MUFCA. *Id.* ¶¶ 51–59.

Counts IV through V concern changes of beneficiaries on the other two sets of policies, also under MUFCA. In Count IV, the Bank alleges that David fraudulently changed the beneficiary status of the split dollar policies from SCS—to which the beneficiary status lapsed upon Betty's death—to the Blue Heron Trust. *Id.* ¶¶ 60–64. In Count V, the Bank alleges that David fraudulently changed the beneficiary status on the JDB policies from John's estate to the Blue Heron Trust. *Id.* ¶¶ 65–74. Finally, in Count VI the Bank alleges David breached his fiduciary duty to SCS's creditors, *id.* ¶¶ 75–79, and in Counts VII through VIII the Bank sought a declaratory judgment that the Osprey and Blue Heron Trusts and the John Handcock policy transfers were void as beyond David's authority as guardian of the property, *id.* ¶¶ 80–98.

The parties eventually filed cross motions for summary judgment. After a hearing on November 27, 2017, before the Hon. Roger W. Titus,[3] Judge Titus granted summary judgment in the Buckingham's favor on all counts. *See* ECF No. 149. As to the MUFCA counts (Counts I–V), the Court concluded that the unclean hands doctrine barred the Bank from asserting any right to the proceeds of the insurance policies. *Id.* at 10. The Court reasoned that because the Bank had already attempted through "grossly inequitable conduct" to secure priority interests in the insurance policies via the second forbearance agreement, the Bank was precluded from suit to recapture its interest in this Court. *Id.* at 10–13.

Alternatively, the Court concluded that even if the unclean hands doctrine did not apply, summary judgment in the Buckinghams' favor was nonetheless warranted on the MUFCA counts. On Count I, the Court found that no reasonable trier of fact could view the sale of the JDB policies as fraudulent because the sale was "done for fair consideration and thus is not a

---

[3] After the death of Judge Titus on March 3, 2019, the case was reassigned to this Court.

fraudulent conveyance as a matter of law." *Id.* at 13–16. On Counts II through V, each as pertaining to a change of beneficiary status, the Court held that the alleged wrongful conduct fell outside the purview of MUFCA. The Court concluded that MUFCA, by its terms, only applied to "conveyances," defined as "includ[ing] every payment of money, assignment, release, transfer, lease, mortgage, or pledge *of tangible or intangible property*, and also the creation of any lien or incumbrance." Md. Code Ann., Com. Law § 15-201(c) (emphasis added). Looking to the phrase "tangible or intangible property," the Court reasoned that any "assignment, release, transfer, lease, [or] mortgage" must be a property interest to fall under this definition. ECF No. 149 at 16. Thus, and because Maryland common law suggested that a change in beneficiary status did not amount to a property interest, the Court held that the changes in beneficiary status here could not be a conveyance falling within the ambit of MUFCA. *Id.* at 16–20. As to Counts VI through VIII, the Court held that the Bank lacked standing to either prosecute a breach of fiduciary duty action against David or seek a declaratory judgment that the transfer of the John Handcock policies, or creation of the Blue Heron and Osprey Trusts were void *ab initio*. *Id.* at 20–25.

The Bank appealed the Court's decision to the United States Court of Appeals for the Fourth Circuit. On February 21, 2019, the Fourth Circuit reversed and remanded Counts I through V (the MUFCA counts) and affirmed the grant of summary judgment on Counts VI through VIII. ECF No. 161-1. As to Counts I through V, the Fourth Circuit rejected the district court's application of the unclean hands doctrine. ECF No. 161-1 at 10–15. The Fourth Circuit next concluded that summary judgment was inappropriate as to the sale of the John Hancock policies forming the basis of the MUFCA claim in Count I because the disparity in sale price to the Trust versus the value of the accelerated death benefits created a genuine issue of disputed

9

fact. *Id.* at 16–18.

As to Counts II through V, the Fourth Circuit directed that this Court on remand reconsider the propriety of summary judgment in light of "applicable Maryland estate and trust law and potentially applicable Maryland insurance law," particularly whether David exceeded the scope of his power as guardian of John's property under Md. Code Ann., Est. & Trusts § 15-102(t) (identifying powers of a guardian of the property as to life insurance policies) and whether Md. Code Ann., Ins. § 16-111(d) (changing insurance beneficiary is "valid except for transfer with actual intent to hinder, delay, or defraud creditors") should bear on the Court's interpretation of MUFCA. ECF No. 161-1 at 19–20. As to the remaining counts, the Fourth Circuit affirmed the Court's grant of summary judgment on Count VI because the Bank waived appellate review on this claim and on Counts VII and VIII which sought unavailable declaratory relief. *Id.* at 18 n.7.

On remand, both parties renewed their cross motions for summary judgment and briefed the applicability of Md. Code Ann., Est. & Trusts § 15-102(t) and Md. Code Ann., Ins. § 16-111(d). ECF Nos. 168, 170–71, 173. This briefing clearly demonstrated to this Court that little, if any, guidance exists as to the applicability of such provisions, and thus, for this Court to follow the Fourth Circuit's directive would amount to writing on a clean slate as to questions involving the interpretation of Maryland statutory and common law. Accordingly, on March 5, 2020, this Court requested that the parties address the propriety of certifying two questions to the Maryland Court of Appeals. ECF No. 180. The parties ultimately agreed that certification was proper because the issues are complex, the statutory provisions are outcome determinative, and no Maryland authority exists on point. ECF Nos. 182, 184.

This Court, therefore, now certifies the following two questions:

1. Whether the Maryland Uniform Fraudulent Conveyances Act, *see* Md. Code Ann., Com. Law §§ 15-201 *et seq.*, which generally applies to "conveyances" made with the intent to hinder, delay, or defraud creditors, reaches a change in life insurance beneficiary, particularly in light of Md. Code Ann., Ins. § 16-111(d)?

2. Whether Md. Code Ann., Est. & Trusts § 15-102 grants a guardian of property the authority to change the beneficiaries of life insurance policies?

In support of this decision, the Court first discusses the standard for determining the propriety of certification and next why certification is warranted in this case.

## II.     Maryland Uniform Certification of Questions of Law Act

The Maryland Uniform Certification of Questions of Law Act provides that the Maryland Court of Appeals may address "question[s] of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute." Md. Code Ann., Cts. & Jud. Proc. § 12-603. The Act is designed "to promote the widest possible use of the certification process." *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 705 (2010) (emphasis omitted). This is because, when properly used, certification "ensur[es] the correct legal outcome, aid[es] in judicial economy, and manifest[s] proper respect for federalism." *Sartin v. Macik*, 535 F.3d 284, 291 n.6 (4th Cir. 2008).

Tracking of the language of the Act, the Fourth Circuit has prescribed a two-step inquiry for determining whether certification is appropriate. First, the referring Court must consider whether the question at hand "may be determinative of an issue in pending litigation." *Antonio v. SSA Sec., Inc.*, 749 F.3d 227, 234 (4th Cir. 2014) (quoting Md. Code Ann., Cts. & Jud. Proc. § 12-603). Second, the Court must look to whether there is a "controlling appellate decision, constitution provision, or statute of [Maryland]." *Id.* (quoting Md. Code Ann., Cts. & Jud. Proc. § 12-603). With this standard in mind, the Court addresses the propriety of certification as to each question separately.

11

**A. The First Question**

The First Question—whether a change in beneficiary status amounts to a "conveyance" under MUFCA—is central to Counts III through V, the MUFCA fraudulent conveyance counts based on David's changes of beneficiary status for the pertinent life insurance policies.[4] If the Buckinghams are correct and changes of life insurance policies are not conveyances actionable under MUFCA, then summary judgment must be granted in their favor as to these counts. Otherwise, as the Bank maintains, the action may proceed.

Next, certification is appropriate because no real guidance exists for this Court to resolve this question. With respect to MUFCA generally, the Court begins with its common law underpinnings. Prior to the General Assembly enacting its version of the Uniform Fraudulent Conveyance Act in 1920 (MUFCA),[5] Maryland Courts followed the Statute of Elizabeth. The Statute of Elizabeth, imported from England, provided that any conveyance made with intent 'to delay, hinder or defraud creditors'" must be considered void. *Westminster Sav. Bank v. Sauble*, 183 Md. 628, 630 (1944); *see, e.g.*, *Green v. Trieber*, 3 Md. 11, 12 (1852). It is undisputed that MUFCA codifies the principles previously captured in the Statute of Elizabeth. *Damazo v. Wahby*, 269 Md. 252, 256 n.1 (1973); *Lacey v. Van Royen*, 259 Md. 80, 92 (1970); *Westminster Sav. Bank*, 183 Md. at 630.

MUFCA thus provides, in pertinent part, that "every conveyance made and every

---

[4] Although Count I and II includes as an alleged predicate act the change in beneficiary on the John Hancock Policies, *see* ECF No. 126 ¶¶ 40–45, the alleged fraudulent conveyance is not the beneficiary change itself, but the Defendants' sale of the policies on behalf of SCS to the Osprey Trust (Count I) and securing accelerated death benefits (Count II).

[5] The Uniform Fraudulent Conveyance Act, which served as a model for states to elect passage of similar legislation, was designed to bring consistency to the application of fraudulent conveyance law. Peter Alces & Luther Dorr, *A Critical Analysis of the New Uniform Fraudulent Transfer Act*, 1985 U. Ill. L. Rev. 527, 532 (1985). Maryland courts have also emphasized that "[t]he underlying objective of the uniform act is to enhance and not impair the remedies of creditors." *Damazo v. Wahby*, 269 Md. 252, 257 (1973) (quoting *Lind v. O. N. Johnson Co.*, 204 Minn. 30 (1938)).

obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors." Md. Code Ann., Com. Law. § 15-207. The operative question in this case, however, is whether the change in beneficiary status on the life insurance policies constitutes a "conveyance" under MUFCA. To answer this question, the Fourth Circuit directed that this Court consider the applicability of Md. Code Ann., Ins. § 16-111(d).

On this question, Section 16-111(d) must first be placed in context. Under previous Maryland statutory law "in furtherance of a policy protecting married women," life insurance benefits have been shielded from creditors and from fraudulent conveyance claims in circumstances pertinent here. *See Elliot v. Bryan*, 64 Md. 368 (1885). In particular, a husband's transfer of his life insurance policy to his wife and out of the reach of his creditors could not be voided as fraudulently conveyed. *Id*. ("Elliot had a right to assign the policy to his wife," held the Court, and so "his creditors have no interest in it."); *see also Earnshaw v. Stewart*, 64 Md. 513 (1886).

In 1945, the General Assembly enacted Md. Code Ann., Ins. § 16-111 *et seq.* which grants similar protections. Section 16-111(a) provides that life insurance proceeds for the benefit of children, spouses or dependents, are immune from the claims of creditors. *See* Md. Code Ann., Ins. § 16-111(a) ("The proceeds of a policy of life insurance . . . made for the benefit of or assigned to the spouse, child, or dependent relative of the individual are exempt from all claims of the creditors of the individual."). And as the Buckinghams point out, *see* ECF No. 184 at 2–3, Section 16-111(a) is in harmony with other statutory provisions that exempt life insurance proceeds from the reach of creditors, *see* Md. Code Ann., Cts. & Jud. Proc. § 11-504(b)(2); Md. Code Ann., Est. & Trusts § 11-105(b), (e).

13

Section 16-111(d) of the Insurance Code, however, reads differently with respect to creditors' interests as relevant to changes in beneficiary status. It provides that "a change in beneficiary, assignment, or other transfer is valid *except for transfer with actual intent to hinder, delay or defraud creditors*." *Id.* (emphasis added). Thus, as one commentator has noted, Section 16-111(d) appears to provide some "safeguard" against "possible fraud on creditors by the use of exempt life insurance proceeds." Melvin D. Hill, *Exemption of Life Insurance Cash Surrender Values from Bankruptcy*, 22 Md. L. Rev. 66, 70 (1962). To date, no Court has been called upon to interpret Section 16-111(d), let alone its interplay with MUFCA.

Here, the parties contest vigorously whether Section 16-111(d) allows a change in beneficiary status to support a fraudulent conveyance claim under MUFCA. The Bank points out that Section 16-111(d) uses similar language to MUFCA and argues that this "evidences an intent by the Maryland General Assembly to clarify and declare that beneficiary changes of life insurance fall within the ambit of fraudulent conveyance law." ECF No. 168 at 4–5. The Bank further contends that this preferred interpretation squares with similar provisions enacted in other states. *Id.* at 4–9 (citing N.Y. Ins. Law § 3212(e)(1); *In re Wolensky's Ltd. P'ship*, 163 B.R. 615 (Bankr. D.D.C. 1994), *Headen v. Miller*, 141 Cal. App. 3d 169 (1983), and *In re John Hatton*, 104 B.R. 705 (Bankr. W.D. Pa. 1989)); *see also id.* at 9–10 (citing *Navassa Guano Co. v. Cockfield*, 253 F. 883 (4th Cir. 1918)).

The Buckinghams, on the other hand, contend that because beneficiary status is not "property," changing the beneficiary status cannot amount to a "conveyance" under MUFCA. The Buckinghams particularly point to MUFCA's definition of "conveyance," as "every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." Md. Code Ann., Com.

14

Law § 15-201(c). They also highlight that the Court of Appeals has historically interpreted "beneficiary status" not as property but as a mere expectancy. *See Wooddy v. Wooddy*, 258 Md. 224, 233 (1970); *Durst v. Durst*, 232 Md. 311, 315 (1963). Thus, contend the Buckinghams, when reading the statutory definition of "conveyance" alongside common law interpretation of beneficiary status as a mere expectancy, the claim cannot survive as a matter of law. Section 16-111(d), the Buckinghams insist, must be read narrowly, to apply only "in bankruptcy, in a receivership, [and] in a common law fraud action." ECF No. 168 at 22–23. Predictably, and largely unhelpful to this Court, the Buckinghams rely on out-of-state authority supporting their favored position. *Id.* at 15–16 (citing *First Wis. Nat'l Bank of Milwaukee v. Roehling*, 224 Wis. 316 (1936), *Equitable Life Assurance Soc'y of U.S. v. Hitchcock*, 270 Mich. 72 (1935), *Goren v. Loeb*, 1 A.2d 861 (N.J. Ch. 1938), *Great So. Life Ins. Co. v. Agric. Bldg. Co. Indus.*, No. 01-CV-1112, 2002 WL 924249 (D. Minn. May 1, 2002), and *Wornick v. Gaffney*, 544 F.3d 486 (2d Cir. 2008)).

Because no authority exists in Maryland as to the scope of MUFCA in light of Section 16-111(d), this Court is strongly disinclined to interpret state statutes out of whole cloth. This Court, therefore, easily concludes that in the absence of controlling authority, certification is warranted as to the First Question.

### B. The Second Question

The Second Question asks whether David, as guardian of John's property, had the power pursuant to Md. Code Ann., Est. & Trusts § 15-102(t) to change the beneficiaries on the life insurance policies. It is undisputed that the Circuit Court conferred on John all powers afforded under Md. Code Ann., Est. & Trusts § 15-102. *See* ECF No. 120-4 at 2. The pertinent issue, however, is whether such power includes a change to beneficiary status.

The answer may affect the outcome of the claims, but not all in the same way as the First

Question. For Counts III through V, the Second Question is derivative of the First Question. That is to say, if the Court of Appeals determines that, as a matter of law, a change in beneficiary status is not a "conveyance" actionable under MUFCA, then Counts III through V, alleging a MUFCA violation based solely on change of beneficiary status, fail as a matter of law. Accordingly, whether David had the power to change beneficiary status becomes moot.

As to Counts I and II, however, the alleged fraudulent conveyances are the sale of the John Hancock policies from SCS to the Osprey Trust (Count I) and accelerating the death benefits on the same policies (Count II). Thus, although the change in beneficiary status is pleaded in the Amended Complaint as a predicate act, it is not the gravamen of the alleged fraudulent conveyance. In this respect, the question of David's power to change beneficiary status is relevant to those Counts independent of the First Question.

With the distinction among the Counts in mind, guidance on the Second Question nonetheless will prove important because if David acted without authority to change the beneficiary status on the policies, then the Bank may use David's *ultra vires* conduct as evidence of his fraud. *Cf. Berger v. Hi-Gear Tire & Auto Supply Co.*, 257 Md. 470, 476 (1970) (recognizing "departure from the usual method of business" as an "indicia of fraud"). Conversely, if David were permitted to change the beneficiaries, Defendants may use the fact that David acted lawfully as guardian to undermine the Bank's claims of fraud.

As to whether any guidance from the Maryland courts exists on the scope of Md. Code Ann., Est. & Trusts § 15-102(t), the Court could find none. The provision states that a guardian may:

> exercise options, rights and privileges contained in a life insurance policy, annuity, or endowment contract constituting property of the fiduciary estate, including the right to obtain the cash surrender value, convert a policy to another type of policy, revoke any mode

16

> of settlement, and pay any part or all of the premiums on the policy or contract.

Md. Code Ann., Est. & Trusts § 15-102(t).

The Bank argues that Section 15-102(t) does not expressly confer authority to change beneficiaries on a life insurance policy. ECF No. 168 at 13; *see also* ECF No. 141-1 at 17–18. This makes sense, the Bank contends, because the right to change beneficiaries is generally a personal right unconnected with the preservation of property. ECF No. 168 at 13. The Bank buttresses this contention with the general proposition that "[t]he relationship of guardian to ward is not that of agent to principal . . . [and] [t]he guardian's power is not derived from the ward, but from the appointing court." ECF No. 168 at 11–12 (quoting *Mack v. Mack*, 329 Md. 188, 200 (1993)).

The Buckinghams respond that the change in beneficiary status is subsumed within the clause allowing a guardian to change an "option[], right[], or privilege[] contained in a life insurance policy." ECF No. 170 at 23–24. That is, while Section 15-102(t) lists certain "examples" that the guardian's power "includes," Maryland rules of construction make clear that this list is one of illustration, not exclusion. *Id.* at 24 (citing Md. Code Ann., Gen. Provis. § 1-110). The Buckinghams further emphasize that changing beneficiaries is among the most basic "rights" the policy holder retains, and thus the guardian who steps into the shoes of the holder must likewise retain that power. *Id.* Again, no authority exists as to the Second Question. Accordingly, because guidance from Court of Appeals as to this question is potentially outcome determinative and involves solely state statutory and common law interpretation, this Court finds certification appropriate.

### III. Conclusion

For the reasons discussed above, the Court hereby certifies the foregoing questions of law to the Maryland Court of Appeals and STAYS these proceedings. A separate Order follows.

___3/27/2020_____  ___/s/_____
Date                         Paula Xinis
                             United States District Judge